IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF ELECTRONIC DEVICES LOCATED AT A SECURE LOCATION IN THE LYNCHBURG POLICE DEPARTMENT LABELED AS ITEM 2 AND ITEM 4 UNDER CASE NUMBER 2025-000680.** | ) <br> )    <u>**FILED UNDER SEAL**</u> <br> ) <br> ) <br> )    Case No.   6-25-mj-14 <br> ) <br> ) |

**AFFIDAVIT IN SUPPORT OF
<u>AN APPLICATION FOR A SEARCH WARRANT</u>**

I, Daniel Bailey, being first duly sworn, hereby depose and state as follows:

<u>**INTRODUCTION AND AGENT BACKGROUND**</u>

1.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of a certain electronic device, more fully described below and in Attachment A, which is currently in law enforcement possession, and the extraction from this device of electronically stored information described more fully herein and in Attachment B.

2.    I am a Task Force Officer with the Drug Enforcement Administration (DEA) and have been since 2017. I am also a Detective with the Lynchburg Police Department (Virginia) and have been so employed since 2002. I am currently assigned to investigate drug trafficking organizations as a member of the DEA, Washington Field Division/Roanoke Resident Office. My duties as a Task Force Officer involve the investigation of various criminal activities of narcotics traffickers and their associates. In investigating these matters, I have acted as a case agent, an undercover agent, and a contact agent for confidential sources. These investigations have resulted in the issuance of federal search warrants, seizure warrants, indictments, and convictions of persons for federal narcotics and firearm violations. During my employment as a

law enforcement officer, I have received multiple hours of training in narcotics enforcement and investigative techniques, and I have personally participated in numerous investigations. I have also spoken on numerous occasions with informants, suspects, and other experienced narcotics traffickers concerning the methods and practices of drug traffickers, including the methods and practices used by traffickers of methamphetamine, fentanyl, heroin, and cocaine. I have been involved in the execution of numerous search warrants on electronic devices, including cellphones, and in obtaining location information for those devices.

3. Based on my training and experience investigating narcotics and the distribution of narcotics, I know that it is common for individuals engaged in this activity to use telephonic communications, both cellular (to include voice and text messages) and hard line, to further their criminal activities. I know that "smart" phones play an integral role in the daily lives of individuals engaging in narcotics trafficking and that these individuals use cellular telephones to exchange information with customers and/or source(s) of supply through text messaging, instant messaging, and telephone conversations. I also know that it is common for narcotics trafficker to use multiple "smart" phones to communicate with co-conspirators in order to compartmentalize their illegal activity and avoid detection by law enforcement. Further, I know it is common for narcotics traffickers to change their phones and phone numbers in order to avoid detection by law enforcement.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

5. The property to be searched is as follows:

   a. Cellular phone in a Lynchburg Police evidence bag marked as Item 2 (hereafter "TARGET DEVICE #1") of Lynchburg Police Department case number 2025-000680; currently stored at the Lynchburg Police Department.

   b. Tablet in a Lynchburg Police evidence bag marked as Item 4 (hereafter "TARGET DEVICE #2") of Lynchburg Police Department case number 2025-000680; currently stored at the Lynchburg Police Department.

## STATEMENT OF PROBABLE CAUSE

6. The United States, including the Drug Enforcement Administration ("DEA"), Bureau of Alcohol, Tobacco, and Firearms ("ATF"), and the Lynchburg Police Department are conducting a criminal investigation of Dashun FORD (hereafter "FORD") and others regarding the conspiracy to distribute methamphetamine in violation of 21 U.S.C. § 846.

7. On about January 13, 2025, law enforcement was conducting criminal interdiction along Route 29 North in Pittsylvania County, Virginia within the Western District of Virginia. Law enforcement observed a vehicle travelling into Virginia from North Carolina at approximately 11:55 PM.

8. A query of that vehicle's license plate through a law enforcement database revealed that the vehicle was traveling south from Lynchburg, Virginia on the evening of January 12, 2025 and arriving in Dekalb County, GA on the morning on January 13, 2025. The vehicle was last reported in Georgia at approximately 3:47 PM. Based on this timeline, it would suggest that the vehicle travelled from Virginia to Dekalb County, Georgia, and back to Virginia in a span of less than twenty-four hours.

9. This affiant knows through his training and experience that Dekalb County, Georgia in a jurisdiction that encompasses Atlanta, Georgia. This affiant knows that Atlanta,

3

Georgia is a hub for large scale Drug Trafficking Organizations that supply narcotic traffickers who operate in the Western District of Virginia. This affiant knows that drug traffickers will typically make long, continuous drives (to/from source of supply locations) in order to expedite the delivery of the illicit narcotics.

10. While following the vehicle, law enforcement observed the vehicle cross over the marked center lane, in which half of the vehicle cross over, on at least three occasions. Members of the Pittsylvania County Sheriff's Office executed a traffic stop on the vehicle and identified the driver as Dashun FORD and the passenger as Makeda VASSAL.

11. During the course of the traffic stop, a law enforcement canine, certified and trained in narcotic detection conducted an open-air sniff around the vehicle. The handler advised that the canine alerted to the presence of the odor of narcotics coming from/about the vehicle.

12. A search of the trunk of the vehicle yielded a large storage tote. Inside that tote were sixteen gallon-sized Ziploc bag containing a crystalline substance. In my training and experience, this substance was consistent with the methamphetamine. The total approximate weight of the bags was forty-five pounds. I know that this amount of methamphetamine is consistent with the intent to distribute.

13. Upon locating the substance, FORD attempted to flee on foot. FORD ran for several hundred yards before was taken in custody. While FORD was running, FORD dropped his cellular phone (TARGET DEVICE #1).

14. Further search of the vehicle yielded two digital scales and a tablet device (TARGET DEVICE #2). I know that digital scales are a tool of the drug trade and used when trafficking narcotics.

15. Law enforcement conducted a post-*Miranda* interview of FORD. FORD advised he was going to be paid an unspecified amount of money to pick up whatever was in the tote. FORD advised he did not know what was in the tote.

16. Law enforcement conducted a post-*Miranda* interview of VASSAL. VASSAL advised they had just travelled to Georgia and met an unknown male. VASSAL advised that FORD exchanged a box with that male for the tote that was found in the trunk of the vehicle. VASSAL advised she did not know what was in the tote.

17. FORD was charged with possession of methamphetamine with the intent to distribute.

18. I know from training and experience that drug distributors often use cellular phones to arrange drug deals by using the calling feature, text message feature, or a communication-based application and as set forth above. An analysis of call patterns can identify other drug dealers and illegal firearm possessors. Photographs or videos found on cellular telephones often show contraband, or locations where contraband may be found. Contact numbers stored in cellular telephone(s) may identify other drug distributors or associates. I know from training and experience that persons who distribute illegal narcotics often use multiple phones to hide evidence of their crimes from law enforcement and often subscribe them in fictitious names. And here, examining further identifiers on the phones could prove FORD's identities as sources of supply. I know from my training an experience that drug traffickers often use multiple cellular devices to further their drug trafficking organization. This affiant knows that drug traffickers use multiple devices to serve specific roles within their trade. For example, one device is often used to communicate solely with a source of supply while a second device may be solely used to communicate with the trafficker's customers of narcotics.

All told, significant evidence of criminal activity can be found within cellular telephones found in the possession of a drug dealer.

## TECHNICAL TERMS

19. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. *Wireless telephone:* A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b. *Digital camera:* A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

   c. *Portable media player:* A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

   d. *GPS:* A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some

      GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. *PDA:* A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. *Tablet:* A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. *Pager:* A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h. *IP Address:* An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP

addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. *Internet:* The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

20. Based on my training, experience, and research, I know that the device described in Attachment A has capabilities that allows it to serve as a wireless telephone, phone book, digital camera, digital recorder, GPS Navigation, portable media player, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

21. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.

22. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

8

  d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

  e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

23.  *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it contains evidence described by the warrant.

24.  *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

25.  I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the device described in Attachment A, in order to seek the items

described in Attachment B.

## OATH

The information in this affidavit is true to the best of my knowledge and belief.

Respectfully submitted,

_____
Daniel Bailey, Task Force Officer
Drug Enforcement Administration

Received by reliable electronic means and sworn and attested to by telephone on this 15th day of January 2025.

_____
C. KAILANI MEMMER
UNITED STATES MAGISTRATE JUDGE